UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re:                                                    Chapter 11

Penns Grove Ventures LLC,                                  Case No. 25-40440 (JMM)

                                    Debtor.
---------------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION TO DISMISS OR, ALTERNATIVELY, VACATE THE AUTOMATIC STAY

The debtor herein, Penns Grove Ventures LLC (the "<u>Debtor</u>") respectfully submits this Opposition to the motion (the "<u>Motion</u>") filed by Penns Grove Apartments LLC ("<u>PGA</u>") seeking dismissal of the Chapter 11 case pursuant to 11 U.S.C. §1112(b) or, alternatively, to vacate the automatic stay pursuant to 11 U.S.C. §362.  For the reasons set forth below, the Motion should be denied.

### Preliminary Statement

1.     This case was filed to preserve the Debtor's rights under a Purchase and Sale Agreement dated February 21, 2023 (the "<u>PSA</u>") pursuant to which the Debtor agreed to purchase certain real property consisting of a 144-unit residential apartment complex known as Penns Grove Apartments, located on Helms Cove Lane, in the Borough of Penns Grove, Salem County, New Jersey (the "<u>Property</u>") from PGA.

2.     Following disputes between the parties over whether certain extensions of the closing deadline were granted, PGA commenced an action in the Superior Court of New Jersey, Salem County ("<u>Superior Court</u>"), seeking to terminate the PSA and seize the deposit.  The Debtor counterclaimed and filed a lis pendens.  Thereafter, PGA moved to discharge the lis pendens, which motion was granted by the Superior Court.  That litigation was still pending

1

when the Debtor filed its Chapter 11 case to obtain a stay barring PGA from selling the Property to a third party while the Debtor seeks to enforce its rights to close the transaction.

3.    PGA now moves to dismiss the Debtor's case, or, in the alternative, for stay relief, arguing that the discharge of the lis pendens by the Superior Court is entitled to preclusive effect barring the Debtor from seeking equitable relief from the Bankruptcy Court, and limiting the Debtor to monetary damages on its counterclaim.  This, PGA contends, effectively means that the Debtor has no PSA to assume, and nothing to reorganize, rendering the Chapter 11 petition a bad faith filing.

4.    There are many holes in PGA's logic, the most important of which is that the preliminary ruling by the Superior Court is not a final judgment entitled to preclusive effect. Moreover, as explained below in detail, under long standing New Jersey appellate decisional law, the Superior Court improvidently granted PGA's motion to discharge the lis pendens because the motion did not also seek to dismiss the counterclaim upon which the lis pendens was based.

5.    Nor is this a two party dispute, as the Debtor owes more than $131,000 to four other creditors.  In short, the Debtor has both a subjective and objective basis for believing that it can reorganize through the assumption and closing on the PSA, and filed this Chapter 11 case with the good faith goal of maintaining the status quo and prevent a third-party sale of the Property while the parties resolve their disputes.

**Background**

6.    Because the focus of the Motion is on an interlocutory Order of the Superior Court, a lengthy history of the disputes between the parties, and a detailed analysis of the subject PSA are not required for the Court to decide the Motion.  It suffices to say that the parties

entered into a PSA, and that the parties dispute whether the closing deadline was extended by mutual agreement, and if not, whether the PSA was properly terminated by PGA. To the extent that the Court requires further details, the facts, as the Debtor sees them, relating to the underlying the disputes between the Debtor and PGA are set forth in the Counterclaim filed in the Superior Court, a copy of which is annexed hereto as <u>Exhibit</u> "A", and incorporated herein by reference.

7.      Insofar as the pending litigation before the Superior Court is concerned, a short summary may be helpful. Following the break down in negotiations between the parties, PGA commenced its litigation seeking the forfeiture of the deposit. In response, the Debtor answered the complaint, asserting various counterclaims, and filed a lis pendens.

8.      Thereafter, PGA moved to discharge the lis pendens. Importantly, it did not seek to dismiss the counterclaim, but only challenged the lis pendens. Following a hearing on September 27, 2024, the Superior Court entered an Order granting the motion and discharging the lis pendens, leaving open the counterclaims for damages.

9.      PGA subsequently moved for summary judgment, which motion was stayed by the filing of the Debtor's Chapter 11 petition.

10.     By virtue of the Court's Order, PGA was no longer barred from attempting to sell the Property to a third-party, subject to claims by the Debtor for monetary damages. However, the Debtor still seeks to pursue a closing under the PSA, and for this reason has sought the protection of Chapter 11.

**LEGAL ARGUMENT**

**The Chapter 11 Case Was Filed In Good Faith and Should Not be Dismissed**

11.     PGA never expressly invokes the doctrines of Rooker/Feldman, res judicata or collateral estoppel, and certainly fails to cite any case law whatsoever on the issue of the preclusive effect of a prior state court ruling in a subsequent bankruptcy case.  Rather, PGA merely presumes that because it obtained an interlocutory order granting its motion to discharge the Debtor's lis pendens, the Debtor has no rights whatsoever under the PSA.  From there, PGA posits that the Chapter 11 is a bad faith litigation tactic rather than a good faith effort to reorganize.

12.     Nothing could be further from the truth.  While res judicata bars the re-litigation of claims which were previously determined, and collateral estoppel bars the re-litigation of issues which were previously decided, neither doctrine is applicable here as there was never a final, appealable judgment by the Superior Court. As the Second Circuit has explained:

> Under the doctrine of [res judicata], a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

*Leather v Eyck*, 180 F.3d 420, 424 (2d Cir 1999).  The same rule applies to the application of collateral estoppel, where the party invoking issue preclusion must establish:

> (1) the issues of both proceedings must be identical, (2) the relevant issues [must have been] *actually litigated* and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues [must have been] necessary to support a valid and final judgment on the merits.

*Id.*, at 426.

13.     Moreover, the analysis does not change whether one applies federal or New York law on preclusion.  *See,  Algonquin Power Income Fund v Christine Falls of New York, Inc.*, 362

Fed Appx 151, 154 (2d Cir. 2010) ("there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel.").

14.    Since the subject Property is located in New Jersey, where the state court litigation was commenced, it is also noteworthy that New Jersey law likewise requires a final judgment. *See, First Union Nat. Bank v Penn Salem Mar., Inc.*, 190 NJ 342, 352 (2007) (among other elements, the party seeking to bar re-litigation must establish that "the court in the prior proceeding issued a final judgment on the merits").

15.    The Rooker/Feldman doctrine is also inapplicable here. Under Rooker/Feldman, the Bankruptcy Court cannot sit in appellate review of a state court decision. However, this, too, requires finality. As the Supreme Court has explained:

> Recalling *Rooker,* this Court's opinion in *Feldman* observed first that the District Court lacked authority to review a final judicial determination of the D.C. high court. "Review of such determinations," the *Feldman* opinion reiterated, "can be obtained only in this Court." 460 U.S., at 476, 103 S.Ct. 1303.

*Exxon Mobil Corp. v Saudi Basic Indus. Corp.*, 544 US 280, 285, 125 S Ct 1517, 1522 (2005).

16.    There is no question that the decision of the Superior Court to discharge the lis pendens was not a final judgment. Indeed, New Jersey law is clear that the decision is not subject to appeal as of right, but, as an interlocutory ruling, can only be appealed with leave of the appellate court. *See, e.g. Vitanza v. James*, 397 N.J.Super. 516, 517 (App. Div. 2008) ("leave to appeal was neither sought nor obtained. Accordingly, we dismiss the appeal. We may grant leave to appeal from interlocutory orders, including those granting partial summary judgment, in the interest of justice. The grant of interlocutory review is highly discretionary and customarily exercised only sparingly.") (internal quotation marks and citations omitted).

17.    Accordingly, the central premise of PGA's motion, that the termination of the PSA and the rights of the Debtor thereunder were already finally determined, has no merit

whatsoever.  In fact, the Debtor has substantial legal arguments to support its rights under the

PSA, such that its decision to file for Chapter 11 protection cannot be viewed to have been made

in bad faith.  Those arguments need not be addressed at this time, since there can be no dispute

that the Order relied upon so heavily by PGA is support of its Motion is, in fact, interlocutory,

and therefore is neither final nor binding.

18.     Moreover, it is worth noting that, in addition to the legal challenges, there is long-

standing case law which holds that the Superior Court should not have considered the motion to

discharge the lis pendens in the first place, because there was no concomitant challenge to the

underlying counterclaim seeking equitable (as well as monetary) relief, and which formed the

basis for filing the lis pendens.  In *Polk v Schwartz*, 166 N.J.Super. 292, 299-300 (App. Div.

1979), the Appellate Court reversed the discharge of a lis pendens where there was no concurrent

challenge to the underlying complaint finding that:

> it was not appropriate for defendants to move directly for a discharge of the
> notice; instead, they should have moved either to dismiss the complaint or
> pertinent counts thereof for failure to state a claim upon which relief can be
> granted or for summary judgment, which motion would have included a  request
> to discharge the notice of Lis pendens. In that way, the legal sufficiency of the
> count in question or of the facts therein stated, or the existence of genuine issues
> of material fact, could have been tested in accordance with well-settled applicable
> rules of law.

19.     Thus, in addition to all of the legal arguments that the Debtor may assert on

appeal to challenge the preliminary ruling by the Superior Court, there are also potential

procedural challenges to the interlocutory Order.

20.     In light of the open issues regarding the Debtor's right to close under the PSA, the

Chapter 11 case was filed in good faith.  There is nothing in the Bankruptcy Code that makes a

company facing forfeiture of contract rights somehow ineligible for Chapter 11 relief even if it

frustrates the other party.  In the familiar words of the legendary former Judge Richard Posner of

the Seventh Circuit, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" *Matter of James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).

21.     In the Second Circuit, the framework for a good faith/bad faith analysis emanates out of *In re Cohoes Industrial Terminal Inc.*, 931 F.2d 222 (2d Cir. 1991) ("*Cohoes*") and *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997) ("*C-TC*").  In *Cohoes, supra*, an attack was made under Rule 11 after a bankruptcy petition was filed to challenge the constitutionality of a state court default judgment terminating a lease.  One of the questions posed was "whether it is frivolous for a corporation in financial distress, but not *in extremis,* to make a Chapter 11 filing if one of the purposes for the filing is to attack collaterally a state court default judgment".  *Cohoes, supra,* 931 F.2d at 224.

22.     The Circuit Court answered this question squarely in the negative and reversed an award of sanctions.  In reaching this conclusion, the Circuit Court of Appeals made a number of important observations which should help guide the Court here:

> A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693, 698–702 (4th Cir. 1989); *In re Coffee Cupboard, Inc.,* 119 B.R. 14, 17–18 (E.D.N.Y. 1990); *In re Marion Street Partnership,* 108 B.R. 218, 223 (Bankr. D.Minn. 1989). **Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the totality of the circumstances, there is substantial evidence to indicate that the debtor made a bad faith filing**. *See* 5 C. King, *Collier on Bankruptcy* § 1112.03, at 112–33 (15th ed. 1989).

*Id.*, at 227 (emphasis supplied).  The Court went on to state that:

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself "establish an absence of intent to seek rehabilitation." *Banque de Financement, S.A. v. First National Bank,* 568 F.2d 911, 917 (2d Cir. 1977). Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing

7

room from creditors, it is almost inevitable that creditors will, in some sense, be "frustrated" when their debtor files a bankruptcy petition. *See, e.g., In re Food Workshop, Inc.,* 70 B.R. 962, 967 n. 3 (Bankr. S.D.N.Y. 1987). In reality, there is "a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose." *Collier* § 1112.03, at 1112–33.

*Id.*, at 228.

23.     In the Second Circuit's subsequent opinion on good faith, in *C-TC, supra*, the debtor there, being a partnership in dissolution, was deemed ineligible for bankruptcy relief as a matter of law.  This alone mandated dismissal of the bankruptcy case.  In fact, the matter was largely decided in the lower courts on the basis of the debtor's ineligibility without any discussion by the District Court of bad faith.  The Circuit Court of Appeals affirmed the Debtor's ineligibility, and then took the opportunity to address the concept of bad faith.  Noting that bad faith is not *per se* an enumerated ground for dismissal under Section 1112(b), the Second Circuit then identified factors to be consider which have become popularly known in New York as the *C-TC* Factors.   These factors are identified as follows:

    (1)   the debtor has only one asset;

    (2)   the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

    (3)   the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

    (4)   the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

    (5)   the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

    (6)   the debtor has little or no cash flow;

    (7)   the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)    the debtor has no employees.

*C-TC, supra,* 113 F.3d at 1311.

24.    Importantly, PGA relies upon a myopic checkoff of the *C-TC* Factors without regard to the totality of the circumstances.  Under PGA's analysis, it is virtually impossible for any real estate contract vendee to file a good faith petition as, by definition, there are often few creditors, no cash flow and no employees.  Thus, the Courts have recognized that while the *C-TC* Factors certainly help define bad faith, the lynchpin of the analysis still revolves around the dual inquiry of whether, on the filing date, there was no reasonable likelihood that the debtor intended to reorganize and no reasonable prospect that the debtor was able to reorganize.

25.    Indeed, the Hon. Nancy Hershey Lord has previously cautioned that the Court:

> will not engage in a mechanical counting exercise to determine whether the Debtor filed this bankruptcy case in bad faith.  These factors are to be considered in the context of the totality of the circumstances and not in a vacuum.  No one factor is determinative of good faith . . . ."  (internal quotation marks and citations omitted)

*In re Consolidated. Distributors, Inc., supra,* 2013 WL 3929851 at *7.  *See, also, In re Hartford & York LLC*, 2014 WL 985449, *4 (Bankr. E.D.N.Y. March 13, 2014); *In re R & G Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009) ("Simply checking off these factors on the list does not prove bad faith.").

26.    Rather, PGA must establish both prongs of objective futility and subjective bad faith before a petition can be dismissed for bad faith.  *See, In re 68 West 127th Street LLC,* 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) (analyzing *C-TC* and holding that "[t]he critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if both

objective futility and subjective bad faith in filing the petition are found."); *In re RCM Global Long Term Corp. Appreciation Fund Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ("In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing.").

27.     Here, the evidence will <u>not</u> support a finding of either objective or subjective futility.  To the contrary, the Debtor understands the imperative for the respective rights and obligations under the PSA to be determined, and for the Debtor to close the purchase of the Property under the PSA.  There is nothing in the Bankruptcy Code that precludes the Debtor from attempting to accomplish this.  Indeed, assumption of executory contracts and curing defaults thereunder is in many ways the "bread and butter" of a Chapter 11 case.

28.     As Judge Drain explained in *In re 68 W. 127 St., LLC, supra*, 285 B.R. at 844:

Keeping the primary focus on the permissible uses of the Bankruptcy Code is important because, taken out of context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith.

29.     A similar sentiment was expressed by the Court in *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987), which explained that:

Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.  When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

30.     In this regard, the Ninth Circuit Court of Appeals decision in *In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002) is instructive.  There, the lender challenged the debtor's good

faith in connection with confirmation of the plan, arguing that the plan "was crafted solely to permit the debtors to take advantage of the Bankruptcy Code to profit personally at the expense of a creditor". *Id., at 1074.* In rejecting this argument, the Ninth Circuit stated:

> that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding. In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights. The fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith".

*Id.*, at 1075 (internal citations and quotation marks omitted).

31.     So, too, here, the Debtor seeks to use the Chapter 11 case for a purpose that is well within the normal purview of the Bankruptcy Code, and not for any improper litigation tactic as PGA alleges. *See, In re Walden Ridge Development LLC*, 292 B.R. 58, 64 (Bankr. N.J. 2003) ("In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors . . . It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization").

32.     Accordingly, there is no basis for a finding that the Debtor acted in bad faith either subjectively or objectively, and dismissal should be denied.

### Stay Relief Should Be Denied

33.     For the same reasons that dismissal is not warranted, stay relief should not be granted to PGA. The basic tenets of the automatic stay have been described by the Hon. Martin Glenn in *In re Residential Capital, LLC*, 2012 WL 3423285 (Bankr. S.D.N.Y. Aug. 14, 2012) as follows:

> The automatic stay affords one of the fundamental debtor protections provided by the bankruptcy laws. It maintains the status quo and protects the debtor's ability to formulate a plan for the sale or other disposition of property of the estate. The automatic stay is intended to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas. In this regard, the automatic stay promotes equal creditor treatment and gives the debtor a breathing spell. The automatic stay is critical to debtors because it allows them to focus on their reorganization instead of ligation. (internal quotation marks and citations omitted).

*Id.*, at *4-5.

34.    PGA relies almost entirely on the same allegations of bad faith raised with respect to dismiss to support its request for stay relief. However, as explained above, this petition was not filed in bad faith but as a necessary step to protect the rights of the Debtor from the potential sale of the subject Property before it completed its litigation and had an opportunity to challenge the decision discharging its lis pendens. Nor can PGA argue that the PSA is not necessary for an effective reorganization, as the PSA is the Debtor's only asset.

35.    PGA cites to the well-known *Sonnax* factors, but a proper application of these factors to this case does not support a finding that cause exists to lift the stay. *Sonnax Indus, Inc. v Tri Component Prods. Corp. (In re Sonnax Indus, Inc.)*, 907 F.2d 1280 (2d Cir. 1990).

1.    *Relief Will Not Result in a Complete Resolution of the Issues (Factor No. 1)*

Relief from the automatic stay would not result in a partial or complete resolution of the issues. It would simply allow the litigation to continue, including an appeal from the interlocutory order discharging the lis pendens.

On the other hand, the PSA is integrally connected to this Chapter 11 case, and granting stay relief would effectively stay this case as the Debtor's only asset would be dealt with by another court. The interference to the Debtor's Chapter 11 case would be significant.

Importantly, the rights of other creditors, with claims totaling over $131,000 are not protected or represented by the state court litigation.

2.    *Lifting the Automatic Stay Is Connected to and Will Interfere with the Debtor's Chapter 11 Case (Factor No. 2)*

Factor 2 addresses whether the litigation is sufficiently related to the bankruptcy case. In describing the type of actions unrelated to the bankruptcy proceeding in which stay relief might be warranted, Congress provided the following examples:

> [A] divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case and should not be stayed.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 343-44 (1977); S Rep. No. 95-989, 95th Cong., 2d Sess. 52 (1978), reprinted in 1978 U.S. Code Cong. & Admin.News 5787, 6300.

In sharp contrast to these legislative examples, the issues presented in the pending action constitute core bankruptcy matters relating to assumption of an executory contract under Section 365 of the Bankruptcy Code.

3.    *The Holdover Proceeding Does Not Involve the Debtor as a Fiduciary (Factor No. 3)*

PGA does not assert that the Debtor is a fiduciary. Therefore, the third *Sonnax* factor weighs against lifting the stay.

4.    *There is No Need for the Specialized Tribunal (Factor No. 4)*

Factor 4, considering whether the issues presented need to be tried in a specialized court, also provides no assistance to PGA. Questions involving the provisions of the PSA and whether it was terminated pre-petition, while governed by state law, present "meat and potatoes" issues for the Bankruptcy Court. As such, the Superior Court does not have greater expertise in deciding the questions presented than the Bankruptcy Court, making this case readily

distinguishable from those involving specialized areas of law, such as domestic relations issues (*See, e.g.*, *In re Newman*, 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996); *Robbins v. Robbins*, 964 F.2d 342 (4th Cir. 1992), or a specialized forum (See *In re Marketxt Holdings Corp.*, 428 B.R. 579 (S.D.N.Y. 2010) (deferring to arbitration panel specifically established by the National Association of Securities Dealers to address the issues presented).

5. No Insurer Has Assumed Responsibility for the Holdover Proceeding (Factor No. 5)

No insurer is involved in here.  As a result, the fifth Sonnax factor does not support relief from the stay.

6. *The Holdover Proceeding does not Primarily Involve Third Parties (Factor No. 6)*

The purpose behind the sixth factor has been explained as follows:

> A court may lift a stay for actions which bear little relation to the bankruptcy case.  *See* 2 Collier on Bankruptcy ¶ 362.07, at 362-50 (15th ed. 1982).  Such lack of connection with the title 11 case occurs where the action essentially involves third parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and resolution of the issue in no way frustrates the orderly distribution of assets of the estate.

*In re Mego Intl., Inc.*, 28 B.R. 324 (Bankr. S.D.N.Y. 1983).  Here, the litigation in the Superior Court does not primarily involve third parties, but instead directly concerns the Debtor and its sole asset, the PSA, to the exclusion of all other creditors.  Thus, the sixth *Sonnax* factor supports resolving the issues attendant to the PSA and the treatment of all claims in the Bankruptcy Court.

7. *Litigation In Another Forum Would Prejudice the Interests of Other Creditors (Factor No. 7)*

As with the first *Sonnax* factor, it is indisputable that the interests of other creditors are best served by denying the Motion for stay relief.  Unlike in the Bankruptcy Court, the Debtor's other creditors have no standing to be heard in the Superior Court.  The adjudication of the Debtor's and PGA's respective rights vis-à-vis the PSA should therefore be resolved in the

context of the Debtor's bankruptcy case where this Court can safeguard everyone's rights and claims.

8.    *Whether PGA's Claim is Subject to Equitable Subordination (Factor No. 8)*

The eighth *Sonnax* factor is not applicable and does not support relief from the stay.

9.    PGA's *Success in Will Not Lead to an Avoidable Judicial Lien (Factor No. 9)*

The ninth *Sonnax* factor is not applicable and does not support relief from the stay.

10.    *The Interests of Judicial Economy and Economical Resolution of the Actions Are Best Served by Maintaining the Automatic Stay (Factors No. 10 and 11)*

The question of judicial economy is focused on choosing between two parallel proceedings "to save judicial resources, prevent duplicative litigation, and avoid potentially inconsistent results." *In re Henderson*, 352 B.R. 439 (Bankr. N.D. Tex. 2006).

Here, while a motion for summary judgment was filed, it has not been heard.  Moreover, to the extent that there are disputed facts concerning the communications between the parties regarding whether an extension of the closing was granted, summary judgment will not result in a final decision, but will lead to a subsequent trial.  Conversely, the PSA and all of the issues attendant to its terms and provisions are properly before this Court, and the Debtor submits that this Court should oversee all matters affecting property of the Debtor's estate.

11.  *The Balance of Harms Favors Maintaining the Automatic Stay (Factor No. 12)*

The twelfth *Sonnax* factor, the balance of the harms, also weighs in favor of denial of the Motion.  Permitting the litigation to continue in the Superior Court harms the Debtor's other creditors, who have no standing to be heard.

WHEREFORE, for all of the reasons set forth herein, the Motion should be denied in its entirety.

Dated: New York, New York
       March 19, 2025

Goldberg Weprin Finkel Goldstein LLP
*Counsel to the Debtor*
125 Park Avenue, 12th Floor
New York, New York 10017
Tel: (212) 221-5700

By:      /s/ J. Ted Donovan, Esq.

# EXHIBIT A

Joshua S. Bauchner, Esq. (Attorney ID# 051242013)
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Phone: 646-369-0250
Fax:   973-325-7467
Email: jbauchner@mblawfirm.com
*Attorneys for Defendants Penns Grove Ventures, LLC and*
*Cross Bridge Title, LLC*

|  |  |
|---|---|
| PENNS GROVE APARTMENTS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>PENNS GROVE VENTURES, LLC, and CROSS BRIDGE TITLE, LLC,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – SALEM COUNTY<br><br>DOCKET NO.: SLM-L-95-24<br><br><u>CIVIL ACTION</u><br><br>**PENNS GROVE VENTURES, LLC'S ANSWER TO VERIFIED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** |

Defendant Penns Grove Ventures, LLC ("**Defendant**"), by and through its counsel Mandelbaum Barrett PC, responds to Plaintiff Penns Grove Ventures, LLC's ("**Plaintiff**") Verified Complaint (the "**Complaint**") as follows:

### <u>AS TO PLAINTIFF'S INTRODUCTION</u>

1.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 1, as the allegations contain legal conclusions concerning default, damages, and contractual interpretation to which no response is required.  To the extent a response is required, Defendant denies said allegations.

2.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 2, as the allegations reference documents which speak for themselves.  Defendant denies the allegations to the extent they are inconsistent therewith.

1

3.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 3, as the allegations reference documents which speak for themselves.  Defendant denies the allegations to the extent they are inconsistent therewith.

4.      Defendant admits only that Penns Grove Ventures, LLC paid a total of $550,000 in good faith deposit and closing date extension funds into escrow with Cross Bridge Title, LLC.

5.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 5, as the allegations reference documents which speak for themselves.  Defendant denies the allegations to the extent they are inconsistent therewith.

6.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 6, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  To the extent a response is required, Defendant denies said allegations.

7.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 7, as the allegations reference documents which speak for themselves.  Defendant denies the allegations to the extent they are inconsistent therewith.

8.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 8, as the allegations reference documents which speak for themselves.  Defendant denies the allegations to the extent they are inconsistent therewith.

9.      Defendant neither admits nor denies the allegations raised in Complaint Paragraph 9, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  To the extent a response is required, Defendant denies said allegations.

10.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 10, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  To the extent a response is required, Defendant denies said allegations.

11.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 11, as the allegations contains legal conclusions concerning wrongful refusal, contractual interpretation, and contractual breach to which no response is required.  To the extent a response is required, Defendant denies said allegations.

12.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 12, as the allegations consist of Plaintiff's subjective explanation and description of its sought-after legal relief, to which no response is required.

## AS TO PLAINTIFF'S PARTIES

13.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 13 as they are not directed to Defendant.

14.     Defendant admits only that Penns Grove Ventures, LLC is a Delaware limited liability company with a principal place of business located in New Jersey.

15.     Defendant admits only that Penns Grove Ventures, LLC is a Delaware limited liability company with a principal place of business located in New Jersey.

## AS TO PLAINTIFF'S VENUE

16.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 16, as the allegations contain legal conclusions regarding the propriety of venue to which no response is required.

3

17.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 17, as the allegations contain legal conclusions regarding the propriety of venue to which no response is required.

**AS TO PLAINTIFF'S FACTS**

18.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 18, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

19.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 19, as the allegations reference documents which speak for themselves.

20.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 20, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

21.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 21, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

22.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 22, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

23.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 23, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

24.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 24, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

25.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 25, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

26.     Defendant admits only that Penns Grove Ventures, LLC paid a total of $550,000 in good faith deposit and closing date extension funds into escrow with Cross Bridge Title, LLC.

27.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 27, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

28.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 28, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

29.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 29, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

30.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 30, as the allegations reference documents which speak for themselves and contain legal

4881-7735-8031, v. 1

conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

31.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 31, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

32.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 32, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

33.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 33, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

34.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 34, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

35.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 35, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

36.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 36, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

37.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 37, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

38.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 38, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

39.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 39, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

40.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 40, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

41.     Defendant neither admits nor denies the allegations raised in Complaint Paragraph 41, as the allegations reference documents which speak for themselves and contain legal

conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

42.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 42, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

43.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 43, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and satisfaction to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

44.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 44, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and satisfaction to which no response is required. Defendant denies the allegations to the extent they are inconsistent therewith.

45.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 45, as the allegations reference documents which speak for themselves.

46.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 46, as the allegations reference documents which speak for themselves.

47.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 47, as the allegations contain legal conclusions regarding contractual interpretation, contractual breach, and satisfaction to which no response is required.  To the extent a response is required, Defendant denies said allegations.

4881-7735-8031, v. 1

48.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 48, as the allegations contain legal conclusions regarding contractual interpretation to which no response is required.  To the extent a response is required, Defendant denies said allegations.

49.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 49, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

50.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 50, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

51.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 51, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.  Defendant denies the allegations to the extent they are inconsistent therewith.

52.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 52, as the allegations reference documents which speak for themselves.

53.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 53, as the allegations reference documents and communications which speak for themselves.

54.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 54, as the allegations reference documents and communications which speak for themselves.

55.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 55, as the allegations reference documents and communications which speak for themselves.

4881-7735-8031, v. 1

56.    Defendant denies having ignored any communication attempts and neither admits nor denies the remaining allegations raised in Complaint Paragraph 56, as the allegations reference documents and communications which speak for themselves.

57.    Defendant denies that Penns Grove Ventures, LLC failed to close the transaction by the closing deadlines and neither admits nor denies the remaining allegations raised in Complaint Paragraph 57, as the allegations contain legal conclusions regarding damages, contractual interpretation, and contractual breach.

58.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 58, as the allegations reference documents which speak for themselves. Defendant denies the allegations to the extent they are inconsistent therewith.

**AS TO PLAINTIFF'S COUNT I**
**Breach of Contract**
**(PGA v. Ventures)**

59.    Defendant repeats and realleges all prior responses as if fully set forth herein.

60.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 60, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required.

61.    Denied.

62.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 62, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation to which no response is required. To the extent a response is required, Defendant denies said allegations.

63.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 63, as the allegations reference documents which speak for themselves and contain legal

10

conclusions regarding contractual interpretation to which no response is required. To the extent a response is required, Defendant denies said allegations.

64. Defendant neither admits nor denies the allegations raised in Complaint Paragraph 64, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation, contractual breach, and default to which no response is required. To the extent a response is required, Defendant denies said allegations.

65. Defendant neither admits nor denies the allegations raised in Complaint Paragraph 65, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required. To the extent a response is required, Defendant denies said allegations.

66. Denied.

**AS TO PLAINTIFF'S COUNT II**
**Breach of Contract**
**(PGA v. Cross Bridge)**

67. Defendant repeats and realleges all prior responses as if fully set forth herein.

68. Defendant neither admits nor denies the allegations raised in Complaint Paragraph 68, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required. To the extent a response is required, Defendant denies said allegations.

69. Defendant neither admits nor denies the allegations raised in Complaint Paragraph 69, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required. To the extent a response is required, Defendant denies said allegations.

11

70.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 70, as the allegations reference documents which speak for themselves and contain legal conclusions regarding contractual interpretation and contractual breach to which no response is required.  To the extent a response is required, Defendant denies said allegations.

71.    Denied.

### AS TO PLAINTIFF'S COUNT III
### Declaratory Judgement Under N.J.S.A. 2A:16-52
### (PGA v. Ventures and Cross Bridge)

72.    Defendant repeats and realleges all prior responses as if fully set forth herein.

73.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 73, as they consist of Plaintiff's subjective explanation and description of its sought-after legal relief, to which no response is required.

74.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 74, as they consist of Plaintiff's subjective explanation and description of its sought-after legal relief, to which no response is required.

75.    Defendant neither admits nor denies the allegations raised in Complaint Paragraph 75, as they consist of Plaintiff's subjective explanation and description of its sought-after legal relief, to which no response is required.

76.    Denied.

**WHEREFORE**, Defendant demands judgment in its favor dismissing Plaintiff's Complaint with prejudice, together with an award of counsel fees, costs of suit, and all such other relief as the Court deems just and appropriate.

12

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures,*
*LLC and Cross Bridge Title, LLC*

By: _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.

## AFFIRMATIVE DEFENSES

Defendant raises the following Affirmative Defenses as to all claims that Plaintiff asserts:

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by its having failed to state a valid cause of action.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant acted in accordance with, fulfilled, and discharged any and all duties or obligations they may have owed.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff has not suffered damages.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because the failure to close was caused by the New Jersey Housing and Mortgage Finance Agency.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because any damages that Plaintiff suffered were not proximately caused by Defendant's conduct.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part as at all relevant times Defendant acted reasonably, fairly, justly, and in good faith.

13

4881-7735-8031, v. 1

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant satisfied its obligations owed under the parties' contractual agreement.

## EIGHTH AFFIRMATIVE DEFENSE

If Plaintiff suffered injury or damage, same was the direct, proximate, and sole result of the acts or omissions of third-parties over whom Defendant had no control and for which Defendant is neither responsible nor liable.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of impossibility of performance.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent they are based on alleged obligations of Defendant that are contrary to or absent from the Parties' contract.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because any recovery by Plaintiff would constitute unjust enrichment.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant did not violate any legal duties owed to Plaintiff.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because the Parties' contract is too uncertain and ambiguous in its terms to be specifically enforced.

## FOURTEENTH AFFIRMATIVE DEFENSE

14

Plaintiffs' claims are barred in whole or in part because Defendant complied with all applicable laws, regulations, and standards, and has otherwise conducted itself as a reasonable party under the circumstances.

Defendant reserve the right to amend its pleading to assert such additional defenses as may arise during the continued course of discovery and litigation in this matter.

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures,*
*LLC and Cross Bridge Title, LLC*

By:

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.

## COUNTERCLAIM

Defendant Penns Grove Ventures, LLC ("**Penns Grove Ventures**") alleges as follows by way of Counterclaim against Plaintiff Penns Grove Apartments, LLC ("**Plaintiff**" or "**Counterclaim Defendant**"):

## FACTUAL BACKGROUND

1.      On February 23, 2023, Penns Grove Ventures and Counterclaim Defendant entered into an Agreement of Sale (the "**PSA**") concerning a 144-unit multifamily housing project located on Helms Cove Lane in Penns Grove Borough, New Jersey (the "**Property**").  See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 1.

2.      Per the PSA, Penns Grove Ventures "agreed to buy" and Counterclaim Defendant "agreed to sell" the Property pursuant to "the terms and conditions" set forth in the PSA.  See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 2.

15

3.     Per the PSA, the purchase price for the Property was "Seventeen Million Five Hundred Thousand Dollars ($17,500,000.00)." See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 4, § 2.

4.     Per the PSA, Cross Bridge Title, LLC ("**Cross Bridge**") was to serve as the escrow agent for Penns Grove Ventures' acquisition of the Property. See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 38.

5.     As required by the PSA, on or about February 22, 2023, Penns Grove Ventures paid $450,000 in initial good faith deposit funds into escrow with Cross Bridge. See February 22, 2023 Escrow Payment Receipt, attached to Plaintiff's Complaint as Exhibit 2.

6.     Per the PSA, the initial closing date was set at 180 days after the PSA's effective date, thus falling on August 21, 2023. See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 6, § 3(A).

7.     The PSA granted Penns Grove Ventures the right to extend this closing date twice without the need to obtain Counterclaim Defendant's consent, provided that Penns Grove Ventures deposited an extra $50,000 into escrow with Cross Bridge for each extension. See the PSA, attached to Plaintiff's Complaint as Exhibit 1, page 6, § 3(A).

8.     Penns Grove Ventures did so, paying an extra $100,000 in funds into escrow with Cross Bridge and extending the closing date to October 20, 2023. See September 14, 2023 Escrow Payment Receipt, attached to Plaintiff's Complaint as Exhibit 3.

9.     Cross Bridge is currently holding – and unless directed otherwise by the Court will continue to hold – the $550,000 total that Penns Grove Ventures paid into escrow pending the outcome of this litigation (the "**Escrow Funds**").

4881-7735-8031, v. 1

10.    The PSA also granted Counterclaim Defendant the ability to extend the closing date

at its discretion, provided that any such extension was for less than thirty-days, stating as follows:

> [Counterclaim Defendant] may extend the Closing Date and the
> Closing Deadline for such additional time as may be required to
> effectuate the prepayment of [Penns Grove Ventures'] existing
> financing that is secured by the Property by giving [Penns Grove
> Ventures] written notice thereof at least 10 days prior to the then
> scheduled Closing Date, provided that such additional period shall
> not exceed thirty (30) days.
>
> [See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 6,
> § 3(B).]

11.    The PSA additionally made Cross Bridge's rights, obligations, and limited potential

liabilities in connection with the deal clear, providing that:

> [Counterclaim Defendant] and [Penns Grove Ventures] agree that
> [Cross Bridge] is acting as agent only and shall not be liable to either
> party for any act or omission except as the result of [Cross Bridge]'s
> gross negligence or willful misconduct.  [Cross Bridge] shall be
> entitled to rely upon any document reasonably believed by it to be
> genuine. ***In the event of any dispute between [Penns Grove
> Ventures] and [Counterclaim Defendant] regarding the [Escrow
> Funds], [Cross Bridge] shall be entitled to either: (1) retain the
> [Escrow Funds] (or the portion thereof that is subject to such
> dispute) until it receives joint written instructions from
> [Counterclaim Defendant] and [Penns Grove Ventures] as to the
> disposition thereof; or (2) pay the [Escrow Funds] into a court of
> competent jurisdiction . . . after which payment into court [Cross
> Bridge] shall have no further liability or obligation hereunder.***
>
> [See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 5,
> § 2(E) (emphasis added).]

12.    The PSA stated the following regarding written termination of the agreement:

> A. The obligations of [Counterclaim Defendant] to sell the Property
> . . . and consummate the transaction contemplated hereby are subject
> to the satisfaction of the following condition:
>
> (1) [Penns Grove Ventures] shall have received all of the Approvals
> as contemplated under Section 8(B) below, and provided copies or
> other written evidence thereof to Seller.  If, notwithstanding [Penns

17

Grove Ventures]' efforts as required hereunder, the foregoing condition is not satisfied . . . then [Counterclaim Defendant] shall have the right to terminate [the PSA] *by written notice to [Penns Grove Ventures] on or before such deadline.*

[See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 5, § 2(E) (emphasis added).]

13.     PSA Section 13, which addressed default, imposed the following written notice

provision and the requirement of providing an opportunity to cure any alleged default:

C. *Notwithstanding anything contained in [the PSA] to the contrary, if a party is in breach under [the PSA] (the "Defaulting Party") the other party shall deliver written notice to the Defaulting Party of such breach, and (a) the Defaulting Party shall have until the date that is five (5) business days after the Defaulting Party's receipt of such written notice to cure the breach*, and (b) the Defaulting Party shall not be in default under this Agreement if the Defaulting Party cures such breach on or prior to the date that is five (5) business days after the Defaulting Party's receipt of such written notice.

[See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 29, § 13(C) (emphasis added).]

14.     The PSA also addressed so-called "general assurances," providing that:

25. Further Assurances. In addition to the obligations expressly required to be performed hereunder by Seller and Purchaser, each party agrees to cooperate with the other and to perform such other acts and to execute, acknowledge and deliver, prior to and after Closing, such other instruments, documents and materials as a party may reasonably request and as shall be necessary in order to effect the consummation of the transactions contemplated hereby; provided that no such other instrument, document or material shall either extend or enlarge the obligations of the non-requesting party beyond the express undertakings of this Agreement or shall require or could require the non-requesting party to make any payment or expend any funds which are not expressly provided for herein or which the requesting party shall not reimburse. This Section shall survive Closing and any termination of this Agreement.

[See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 33, § 25.]

15.     After Penns Grove Ventures elected to extend the closing date to October 20, 2023, via its payment of the Escrow Funds, the parties thereafter mutually agreed to further extend the closing date to December 31, 2023.

16.     Specifically, on September 19, 2023, James D. Kerouac, Esq., who was serving as Counterclaim Defendant's counsel for the deal, confirmed to Penns Grove Ventures' then-counsel that "the parties agreed that the outside closing date would be extended to 12/31." See email correspondence, attached to Plaintiff's Complaint as Exhibit 4, pages 3-4.

17.     On December 28, 2023, days prior to the revised closing date, Penns Grove Ventures confusingly received correspondence from Mr. Kerouac purporting to declare the PSA in default and incorrectly referencing that the deal had failed to close by the "October 20, 2023" closing deadline, in direct conflict with his own prior correspondence. See Kerouac letter, attached to Plaintiff's Complaint as Exhibit 8.

18.     As Counterclaim Defendant was aware, for the deal to close by December 31, 2023, it was necessary for Penns Grove Ventures to obtain final closing approval from the New Jersey Housing and Mortgage Finance Agency ("**NJHMFA**").

19.     In advance of the December 31, 2023 date, Penns Grove Ventures had complied with all NJHMFA requirements and provided the NJHMFA with all necessary materials the agency needed to issue final closing approval in time to meet the revised closing date.

20.     However, despite Penns Grove Ventures having complied with all NJHMFA requirements, the agency failed to issue a final closing approval in time for the December 31, 2023 closing date.

21.     The NJHMFA's inability to do so was entirely the result of the agency's own inaction and/or internal issues.

4881-7735-8031, v. 1

22.    Due to the NJHMFA's failure to issue final closing approval, the closing was unable to occur on December 31, 2023 as the parties intended.

23.    Except for the NJHMFA's final closing approval, Penns Grove Ventures had all other necessary funding, approvals, and requirements in place to effectuate the closing.

24.    There were no additional actions that Penns Grove Ventures could have taken to expedite the NJHMFA's process or secure the NJHMFA approval in time to meet the revised closing date.

25.    Following the missed closing date, Penns Grove Ventures has not received any written notice from Plaintiff terminating the PSA.

26.    Similarly, following the missed closing date, Penns Grove Ventures has not received a notice of default from Counterclaim Defendant alerting Penns Grove Ventures to an alleged default and providing a five-day window to cure the alleged default.

27.    Other than for the NJHMFA closing approval, Penns Grove Ventures continues to maintain all requirements to proceed with the closing in place, along with a desire to continue with the parties' agreed-upon deal.

28.    However, since the missed closing, Counterclaim Defendant has refused to cooperate with Penns Grove Ventures and proceed with the deal, despite Counterclaim Defendant having failed to serve a notice of termination, failed to serve a valid notice of default, and failed to afford Penns Grove Ventures the opportunity to cure any alleged default.

## COUNT I
### (*Breach of Contract*)

29.    Penns Grove Ventures repeats and realleges each of the above allegations as if set forth fully herein.

30.     Counterclaim Defendant and Penns Grove Ventures entered the PSA pursuant to which Counterclaim Defendant agreed to sell Penns Grove Ventures the Property for a $17,500,000 purchase price.

31.     Counterclaim Defendant and Penns Grove Ventures mutually agreed to a revised December 31, 2023 closing deadline, which was unable to be met due to the inaction of the NJHMFA, which was beyond Penns Grove Ventures' control.

32.     The PSA provision governing default provides that "[n]otwithstanding *anything* contained in [the PSA] to the contrary," default under the PSA shall not occur unless "the other party" delivers written notice to the defaulting party and allows that party an opportunity to cure. See the PSA, attached to Plaintiff's Complaint as <u>Exhibit 1</u>, page 29, § 13(C) (emphasis added).

33.     Counterclaim Defendant never served Penns Grove Ventures with such a notice of default nor provided Penns Grove Ventures with an opportunity to cure any purported default.

34.     Despite having failed to declare the PSA in default, Counterclaim Defendant refused to cooperate with Penns Grove Ventures and proceed with the parties' contractually obligated deal.

35.     As set forth above, Counterclaim Defendant breached its obligations owed under the PSA.

36.     Due to Counterclaim Defendant's actions Penns Grove Ventures has been and continues to sustain damages.

**WHEREFORE**, Penns Grove Ventures now demands Judgment against Counterclaim Defendant on this First Count, awarding as follows:

(a)     Actual, compensatory, and consequential damages owed;

(b)     Interest, including pre-judgment and post-judgment interest;

21

(c)    Attorneys' fees and costs of suit; and

(d)    Such other and further relief as the Court deems equitable and just.

**COUNT II**
***(Breach of the Implied Covenant of Good Faith and Fair Dealing)***

37.    Penns Grove Ventures repeats and realleges each of the above allegations as if set forth fully herein.

38.    As set forth above, Counterclaim Defendant has acted in bad faith and with the purpose of depriving Penns Grove Ventures of its rights, benefits, and reasonable expectations under the PSA by, among other actions: (1) refusing to proceed with the obligations it owes under the PSA despite having failed to serve a notice of default on Penns Grove Ventures or provide Penns Grove Ventures with an opportunity to cure any alleged default; and (2) failing to serve any form of written termination of the PSA on Penns Grove Ventures.

39.    Counterclaim Defendant's actions constitute breach of the implied covenant of good faith and fair dealing present in the PSA.

40.    Due to Counterclaim Defendant's actions Penns Grove Ventures has been and continues to sustain damages.

**WHEREFORE**, Penns Grove Ventures now demands Judgment against Counterclaim Defendant on this Second Count, awarding as follows:

(a)    Actual, compensatory, and consequential damages owed;

(b)    Interest, including pre-judgment and post-judgment interest;

(c)    Attorneys' fees and costs of suit; and

(d)    Such other and further relief as the Court deems equitable and just.

**COUNT III**
***(Unjust Enrichment)***

22

41.     Penns Grove Ventures repeats and realleges each of the above allegations as if set forth fully herein.

42.     As set forth above, the Escrow Funds were contributed solely by Penns Grove Ventures for the purpose of obtaining additional time for both parties and ensuring that the deal successfully proceeded forward, both of which were benefits for Counterclaim Defendant.

43.     In exchange for contributing the Escrow Funds, Penns Grove Ventures expected to receive the benefit of Counterclaim Defendant proceeding with its obligations owed under the PSA.

44.     Counterclaim Defendant has since refused to proceed with its obligations owed under the PSA, despite having failed to serve a notice of default on Penns Grove Ventures or provide Penns Grove Ventures with an opportunity to cure any alleged default.

45.     Penns Grove Ventures now risks the potential loss of the Escrow Funds, despite Counterclaim Defendant having voluntarily and intentionally breached the PSA.

46.     Counterclaim Defendant would be unjustly enriched were it to successfully obtain the Escrow Funds, as these funds were solely contributed by Penns Grove Ventures, to obtain benefits that were conferred upon Counterclaim Defendant, and as Counterclaim Defendant now seeks to abscond with these funds via an intentional breach of the PSA.

47.     As a result of Counterclaim Defendant's actions Penns Grove Ventures has been and continues to sustain damages.

**WHEREFORE**, Penns Grove Ventures now demands Judgment against Counterclaim Defendant on this Third Count, awarding as follows:

(a)     Actual, compensatory, and consequential damages owed;

(b)     Interest, including pre-judgment and post-judgment interest;

23

(c)     Attorneys' fees and costs of suit; and

(d)     Such other and further relief as the Court deems equitable and just.

**COUNT IV**
***(Specific Performance)***

48.     Penns Grove Ventures repeats and realleges each of the above allegations as if set forth fully herein.

49.     It is undisputed that the PSA is valid and was voluntarily entered into by the parties.

50.     The PSA's terms are sufficiently clear to discern Counterclaim Defendant and Penns Grove Ventures respective obligations thereunder with reasonable certainty.

51.     The issuance of an order compelling Counterclaim Defendant to proceed with the sale of the Property pursuant to the terms of the PSA would not be harsh or oppressive on either party.

52.     Equity favors compelling Counterclaim Defendant's performance under the PSA, as Counterclaim Defendant refuses to proceed with the parties' deal and voluntarily and intentionally breached the PSA.

**WHEREFORE**, Penns Grove Ventures now demands Judgment against Counterclaim Defendant on this Fourth Count as follows:

(a)     Compelling Plaintiff to proceed with the terms of the PSA;

(b)     Awarding Penns Grove Ventures attorneys' fees and costs of suit; and

(c)     Such other and further relief as the Court deems equitable and just.

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures,*
*LLC and Cross Bridge Title, LLC*

By:     _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.

24

## DEMAND TO PRESERVE EVIDENCE

**PLAINTIFF IS HEREBY DIRECTED AND DEMANDED** to preserve all physical and electronic information pertaining in any way to the incident(s) noted herein, Plaintiff's causes of action and/or prayers for relief, any defenses and/or counterclaims, and pertaining to any party, with such information including, but not limited to, electronic data storage, closed circuit TV footage, digital images, computer imagers, cache memory, searchable data, emails, spreadsheets, employment and personnel files, memos, text messages and any and all social or work-related websites, entries on social networking sites (including, but not limited to, Facebook, TikTok, Instagram, etc.) and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

**Failure to do so will result in separate claims for spoliation/destruction of evidence and/or for appropriate adverse inferences.**

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures, LLC and Cross Bridge Title, LLC*

By: _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.

## DESIGNATION OF TRIAL COUNSEL

Defendant hereby designates Joshua S. Bauchner, Esq. as its trial counsel for the instant action.

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures, LLC and Cross Bridge Title, LLC*

By: _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.

25

## CERTIFICATION PURSUANT TO RULE 1:38-7(b)

I certify that all confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures,*
*LLC and Cross Bridge Title, LLC*

By: _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.


## CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to Rule 4:5-1, it is hereby stated that, to the best of my knowledge, information, and belief at this time, the specific matter in controversy is not the subject matter of any other action pending in any Court nor any pending arbitration proceedings.

I hereby certify that there are no other known parties who should be joined in this action at this time.

**MANDELBAUM BARRETT PC**
*Attorneys for Defendants Penns Grove Ventures,*
*LLC and Cross Bridge Title, LLC*

By: _____

DATED: July 11, 2024                    JOSHUA S. BAUCHNER, ESQ.        .